**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| LEXINGTON TECHNOLOGIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TELEGRAM MESSENGER INC., TELEGRAM GROUP INC., and TELEGRAM FZ-LLC,<br><br>Defendants. | CIVIL ACTION NO. 2:26-cv-941<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Lexington Technologies, LLC files this Complaint against Defendants Telegram Messenger Inc., Telegram Group Inc., and Telegram FZ-LLC (collectively, "Telegram") for infringement of U.S. Patent No. 9,912,671 ("the '671 Patent"), U.S. Patent No. 10,693,797 ("the '797 Patent"), U.S. Patent No. 10,999,203 ("the '203 Patent"), U.S. Patent No. 11,089,027 ("the '027 Patent"), U.S. Patent No. 11,295,360 ("the '360 Patent"), U.S. Patent No. 11,694,241 ("the '241 Patent"), and U.S. Patent No. 11,915,281 ("the '281 Patent") (collectively, the "Asserted Patents").

**THE PARTIES**

1. Plaintiff Lexington Technologies, LLC ("Lexington") is a Texas limited liability company located in Allen, Texas.

2. Defendant Telegram Messenger Inc. ("TMI") is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business in Dubai, United Arab Emirates and an office at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110. On information and belief, TMI conducts business as the

provider and operator of Telegram products and services in the United States, the State of Texas, and the Eastern District of Texas, directly or through intermediaries, subsidiaries, distributors, affiliates, agents, retailers, suppliers, integrators, customers, and others. TMI may be served with process through its registered agent, Conyers Trust Company (BVI) Limited, Commerce House, Wickhams Cay 1, P.O. Box 3140, Tortola, Road Town, VG1110, British Virgin Islands, and at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110.

3. Defendant Telegram Group Inc. ("TGI") is a corporation organized and existing under the laws of the British Virgin Islands with its principal place of business in Dubai, United Arab Emirates and an office at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110. On information and belief, TGI is the parent company of TMI and wholly owns TMI. On information and belief, TGI conducts business in the United States, the State of Texas, and the Eastern District of Texas, directly or through intermediaries, subsidiaries, distributors, affiliates, agents, retailers, suppliers, integrators, customers, and others. TGI may be served with process through its registered agent, Conyers Trust Company (BVI) Limited, Commerce House, Wickhams Cay 1, P.O. Box 3140, Tortola, Road Town, VG1110, British Virgin Islands, and at Vista Corporate Services Centre, Wickhams Cay II, Road Town, British Virgin Islands, VG 1110.

4. Defendant Telegram FZ-LLC ("TFZ") is a company organized and existing under the laws of the United Arab Emirates with offices at 3501, 3502, 3601, and 3602, Al Habtoor Business Tower, Marsa, Dubai, United Arab Emirates. On information and belief, TFZ is an indirect subsidiary of TGI. On information and belief, TFZ conducts business as the developer and distributor of Telegram products and services in the United States, the State of Texas, and the

Eastern District of Texas, directly or through intermediaries, subsidiaries, distributors, affiliates, agents, retailers, suppliers, integrators, customers, and others.

5. Telegram is engaged in making, using, selling, offering for sale, and/or importing the Telegram communications platform, including its servers and applications providing authentication, data synchronization, notification delivery, and connection management functionality ("Accused Products") to and throughout the United States, including this District. Telegram also induces its subsidiaries, distributors, affiliates, retailers, suppliers, integrators, and customers in the making, using, selling, offering for sale, and/or importing such products to and throughout the United States, including this District. To this end, Telegram and its foreign and U.S.-based subsidiaries—which act together as part of Telegram's global network of sales and distribution emissaries—have operated as agents of, and for, one another and have otherwise acted vicariously for Telegram as elements of the same business group and/or enterprise. Indeed, they work in concert and in orchestrated fashion, subject to agreements that are far nearer than arm's length, in order to implement a distribution channel of infringing products within this District and the United States.

6. On information and belief, Telegram owns, operates, controls, and/or uses server and network infrastructure located in the United States to provide Telegram products and services to users in the United States, including users in Texas and this District. *See, e.g.*, Decl. of Georgy Azarov ¶¶ 4-6, *QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 10-1 (E.D. Tex. Aug. 17, 2026); https://ipinfo.io/149.154.175.50; https://telegram.org/privacy. Thus, Telegram maintains a physical presence in the United States.

7. Alone and through at least the activities of its subsidiaries, Telegram conducts business in the United States and this District, including making, distributing, and selling Accused

Products that infringe the Asserted Patents. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state….*"); see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

**<u>JURISDICTION AND VENUE</u>**

8. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9. This Court has specific and general personal jurisdiction over Defendants TMI and TFZ consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, TMI and TFZ individually (i) have engaged in continuous, systematic, and substantial business in Texas, and (ii) have committed and continue to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, TMI and TFZ each have purposefully and voluntarily placed, and are continuing to place, one or more Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation

and intent that such products will be sold to and purchased by consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into the United States, this State, and this District.

10. TMI and TFZ have derived substantial revenues from their infringing acts occurring within this State and this District. TMI and TFZ each have substantial business in this State and this District, including (i) at least part of their infringing activities alleged herein and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods and services offered for sale, sold, and imported, and goods and services provided to Texas residents vicariously through and/or in concert with each other and their agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers.

11. This Court has specific and personal jurisdiction over the Defendant TGI directly or through intermediaries (e.g., subsidiaries, distributors, affiliates, retailers, suppliers, integrators, customers, and others), including its subsidiaries, e.g., TMI and TFZ. Through direction and control of such subsidiaries, Defendant TGI has committed acts of direct and/or indirect patent infringement within this State and elsewhere within the United States giving rise to this action and/or has established minimum contacts with this forum such that the exercise of personal jurisdiction over Defendant TGI would not offend traditional notions of fair play and substantial justice. TMI is a wholly owned subsidiary of Defendant TGI and TFZ is an indirect subsidiary of Defendant TGI. The primary business of TMI is the marketing, support, and operation of Telegram products in the United States while the primary business of TFZ is the development and distribution of Telegram products in the United States. Upon information and belief, Defendant TGI compensates TMI and TFZ for marketing, support, operational, development, and distribution

services in the United States. As such, Defendant TGI has a direct financial interest in its subsidiaries, and vice versa.

12. Defendant TGI controls and otherwise directs and authorizes all activities of its subsidiaries, including TMI and TFZ. Such directed and authorized activities include the subsidiaries using, offering for sale, selling, and/or importing the Accused Products, their components, and/or products containing the same that incorporate and/or perform the fundamental technologies covered by the Asserted Patents. Defendant TGI's subsidiaries (including TMI and TFZ) are expressly authorized to distribute, operate, offer to sell, and sell the Accused Products on behalf of Defendant TGI. For example, Defendant TGI contributes to research, design, and development of Accused Products (*see* https://www.scribd.com/document/443289602/Document-81-12, p. 69), and then directs its subsidiaries to distribute, offer for sale, and sell the Accused Products in the United States. *See, e.g., Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904 (E.D. Tex. May 3, 2019). As another example, on information and belief, some TGI personnel hold dual roles that act as employees of TGI and other Telegram-related entities, including TFZ. *See* https://www.scribd.com/document/443289602/Document-81-12, p. 35; *see also* https://telegram.org/privacy (TMI sharing users' personal data with TGI). Defendant TGI's subsidiaries also provide, on Defendant TGI's behalf, operational, marketing, and technical support services for the Accused Products from their servers in the United States. For example, TMI helps maintain a website that advertises the Accused Products, including identifying the applications for which they can be used and providing related support. *See, e.g.*, https://telegram.org/. The referenced website also contains product documentation and other materials related to Defendant TGI's products. For example, the website includes an online customer support platform and blog articles providing documentation and instructions to end users.

Thus, Defendant TGI's subsidiaries, including TMI and TFZ, are agents of TGI and conduct infringing activities on Defendant TGI's behalf.

13. On information and belief, because Defendant TGI's subsidiaries are authorized by Defendant TGI to distribute, offer to sell, and sell Accused Products and/or to perform the fundamental technologies covered by the Asserted Patents, Defendant TGI's subsidiaries' corporate presences in the United States give Defendant TGI substantially the same business advantages it would enjoy if it conducted its business through its own offices and personnel.

14. In addition, Telegram has knowingly induced, and continues to knowingly induce, infringements within this State and this District by advertising, marketing, offering for sale and/or selling Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct and encourage use of infringing functionality with Telegram's knowledge thereof.

15. Telegram intentionally distributes, provides, licenses, operates, and commercializes the Telegram communications platform to users throughout the United States, including users in Texas and this District. *See* https://sensortower.com/blog/2025-q4-unified-top-5-communication-apps-units-us-6070aae1241bc16eb81f5bab (showing Telegram has a substantial U.S. user/revenue base). For example, TFZ is identified as the developer and "Seller" of the Telegram application offered through application marketplaces and other U.S. distribution channels, through which Telegram offers paid products and services, including Telegram Premium and Telegram Stars, at prices denominated in U.S. dollars. *See, e.g.*,

https://apps.apple.com/us/app/telegram-messenger/id686449807; https://play.google.com/store/apps/details?hl=en&id=org.telegram.messenger. On information and belief, residents of Texas and this District have downloaded and licensed the Telegram applications through these distribution channels, purchased Telegram products and services, established Telegram accounts, and repeatedly accessed and used the Accused Products and accused functionality from within Texas and this District. Defendants knowingly and continuously provide the accused Telegram functionality to those Texas users through the Telegram applications and Telegram's cloud-based server infrastructure.

16. Telegram purposefully establishes continuing relationships with users of the Accused Products, including users in Texas and this District. Users who sign up for Telegram are required to accept Telegram's Terms of Service and Privacy Policy, and users who acquire Telegram's application receive a license to the application from its application provider. *See, e.g.*, https://telegram.org/tos; https://www.apple.com/legal/internet-services/itunes/dev/stdeula/. Telegram further enters into paid relationships with Telegram Premium users, who authorize recurring payments for their subscriptions. *See, e.g.*, https://telegram.org/tos; https://telegram.org/faq_premium/. In addition, Telegram is capable of deliberately serving geographically defined markets including markets within Texas and this District. *See, e.g.*, https://telegram.org/privacy ("ads can be shown in a particular country and city"). On information and belief, Telegram maintains such continuing user, licensing, and subscription relationships with residents of Texas and this District.

17. Telegram maintains actual and ongoing commercial relationships with users in Texas. Telegram acknowledges that it maintains group-level revenue data in the ordinary course of business that attributed Telegram revenue to Texas. *See QR Switch, LLC v. Telegram Group*

*Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 35, pp. 1, 4, 10-11 (E.D. Tex. Oct. 08, 2026). Telegram derives revenue from Texas users through, among other things, Telegram Premium subscriptions, Telegram Stars, and other paid Telegram products and services. *Id.*

18. Telegram purposefully communicates with users located in Texas as part of the ordinary operation of the Accused Products. To establish a Telegram account, a user provides Telegram a telephone number identifying the user's country and area code. *See QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 35, pp. 2-3, 10-11 (E.D. Tex. Oct. 08, 2026). Telegram receives that information and sends authentication communications directly to the supplied telephone number, followed by additional communications between Telegram's servers and the user's device to authenticate the device and establish the account. *Id.*

19. Telegram specifically directs personnel and resources toward its United States operations. Telegram's own materials identify personnel with responsibility for "Compliance and Communications—United States and EU" and describe Telegram's cooperation with persons in the United States concerning compliance with United States laws and regulations. *See QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 35, pp. 3-4 (E.D. Tex. Oct. 08, 2026).

20. Defendants TGI and TMI also maintain and operate physical server infrastructure in the United States. TGI and TMI acknowledged that they operate Telegram servers in Miami, Florida. *See* Decl. of Georgy Azarov ¶¶ 4-6, *QR Switch, LLC v. Telegram Group Inc.*, No. 2:26-cv-00254-JRG, Dkt. No. 10-1 (E.D. Tex. Aug. 17, 2026); *see also* https://ipinfo.io/149.154.175.50; https://telegram.org/privacy. Those U.S.-based servers support Telegram's cloud-based communications platform and provide further evidence that Telegram

intentionally established infrastructure within the United States to provide Telegram services to U.S. users.

21. Telegram has established commercial channels specifically for the United States. In addition to distributing the Telegram applications through U.S. application marketplaces, Telegram has authorized Smart Glocal Services Inc., a Delaware corporation located in Wilmington, Delaware, to act as an authorized reseller under license from Telegram for Telegram Premium and Telegram Stars. *See* https://telegram.org/tos/third-party-payments. Telegram therefore deliberately uses U.S.-based commercial intermediaries to market and provide paid Telegram products and services to users in the United States.

22. Telegram users located in Texas and this District use the Accused Products to authenticate their Telegram accounts and devices, send and receive Telegram messages and other application data, receive notifications, and communicate with Telegram's servers over Wi-Fi and cellular networks. In providing those functions to Texas users, Defendants cause the Telegram applications installed on devices located in Texas to communicate with and invoke functionality of Telegram's server-side systems.

23. Telegram has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. Telegram also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its commission of acts of patent infringement as alleged in this Complaint that are purposefully directed towards this State and District.

24. Alternatively, the Court maintains personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(2). Lexington's claims arise under federal patent law, and

upon information and belief, Telegram has never identified another State in which it is subject to general jurisdiction. Telegram has extensive contacts with the United States as a whole, including millions of United States users, distribution and commercialization of its applications through United States application marketplaces, paid subscription and other commercial relationships with United States users, geographically targeted advertising directed to United States markets, personnel specifically assigned responsibility for United States compliance and communications, and Telegram server infrastructure located in Miami, Florida.

25. Upon information and belief, each Defendant has sufficient minimum contacts with the forum because each Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, each Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas, and places its products and/or services, including those accused herein of infringement, into the stream of commerce with the expectation that they will reach this Judicial District, as alleged more particularly below. For example, upon information and belief, the Accused Products are available for purchase in this Judicial District. For further example, Defendants sell Accused Products, either directly or through intermediaries, to customers who use, sell, or offer for sale the Accused Products in this Judicial District.

26. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant is a foreign company that may be sued in any Judicial District, including the Eastern District of Texas. Each Defendant is subject to personal jurisdiction in this Judicial District and has committed acts of patent infringement in this Judicial District. On information and belief, each Defendant through its own acts and/or through its subsidiaries, makes, uses, sells, and/or offers to sell infringing products within this Judicial District, regularly does and solicits

business in this Judicial District, and has the requisite minimum contacts with the Judicial District, such that this venue is a fair and reasonable one.

## THE ASSERTED PATENTS AND TECHNOLOGY

27. Lexington is the sole and exclusive owner of all right, title, and interest in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights in, and to, the Asserted Patents, including the filing of this patent infringement lawsuit. Indeed, Lexington owns all substantial rights in the Asserted Patents, including the right to exclude others and to recover damages for all past, present, and future infringements.

28. The ’671 Patent is entitled, “Multiple data store authentication.” The ’671 Patent lawfully issued on March 6, 2018 and stems from U.S. Patent Application No. 15/362,236, which was filed on November 28, 2016.

29. The ’797 Patent is entitled, “Blocking application traffic for resource conservation in a mobile device.” The ’797 Patent lawfully issued on June 23, 2020 and stems from U.S. Patent Application No. 16/395,483, which was filed on April 26, 2019.

30. The ’203 Patent is entitled, “Offloading application traffic to a shared communication channel for signal optimization in a wireless network for traffic utilizing proprietary and non-proprietary protocols.” The ’203 Patent lawfully issued on May 4, 2021 and stems from U.S. Patent Application No. 16/883,299, which was filed May 26, 2020.

31. The ’027 Patent is entitled, “Multiple data store authentication.” The ’027 Patent lawfully issued on August 10, 2021 and stems from U.S. Patent Application No. 17/226,176, which was filed on April 9, 2021.

32. The ’360 Patent is entitled, “Multiple data store authentication.” The ’360 Patent lawfully issued on April 5, 2022 and stems from U.S. Patent Application No. 17/471,301, which was filed on September 10, 2021.

33. The ’241 Patent is entitled, “Multiple data store authentication.” The ’241 Patent lawfully issued on July 4, 2023 and stems from U.S. Patent Application No. 18/090,137, which was filed on December 28, 2022.

34. The ’281 Patent is entitled, “Multiple data store authentication.” The ’281 Patent lawfully issued on February 27, 2024 and stems from U.S. Patent Application No. 18/207,904, which was filed on June 9, 2023.

35. The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. They are not directed to an abstract idea, and the technologies covered by the claims comprise systems and/or ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

## DEFENDANTS’ PRE-SUIT KNOWLEDGE OF INFRINGEMENT

36. Prior to filing this Complaint, Telegram was put on notice of its infringements of the Asserted Patents by way of communication with Lexington’s licensing agent regarding a potential license to Lexington assets as early as October 1, 2026.

37. On October 1, 2026, Telegram received a letter via FedEx from Lexington via its licensing agent expressly informing Telegram that “the Telegram platform infringes numerous patents in Lexington’s portfolio” and that Telegram therefore required a license to Lexington’s patent portfolio. The letter further offered Telegram immediate access to a data room containing additional infringement materials that included claim charts for the Asserted Patents that evidenced and demonstrated Telegram’s infringement and identified specific infringing Telegram functionality.

38. The accused products addressed in the Counts below include, but are not limited to, functionality identified in Lexington’s communications to Telegram. Telegram’s past and continuing sales of the accused products (i) willfully infringe the Asserted Patents, and (ii)

impermissibly usurp the significant benefits of Lexington's patented technologies without fair compensation.

39. To the extent necessary, Lexington has complied with the requirements of 35 U.S.C. § 287, such that Lexington may recover pre-suit damages.

**COUNT I**

(INFRINGEMENT OF U.S. PATENT NO. 9,912,671)

40. Lexington incorporates the preceding paragraphs herein by reference.

41. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

42. Lexington is the owner of all substantial rights, title, and interest in and to the '671 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

43. The '671 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on March 6, 2018, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

44. Telegram directly infringes one or more claims of the '671 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing data synchronization and notification delivery functionality that incorporate the fundamental technologies covered by the '671 Patent (collectively, "the '671 Accused Products").

45. Telegram directly infringes at least claim 30 of the '671 Patent, including through TMI's direct infringement and TGI's direct infringement through TMI acting as TGI's agent and

on TGI's behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the '671 Patent.

46. By way of illustration only, Telegram's '671 Accused Products comprise each and every element of claim 30 of the '671 Patent. The '671 Accused Products perform "[a] method for authenticating access to one or more data stores." For example, the '671 Accused Products authenticate users and/or devices to access data stored on Telegram servers.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

47. The ’671 Accused Products perform a method comprising “receiving, at a server device, a first notification message of an update in data at one or more data stores, wherein the first notification message comprises an indication of a presence of new data and does not include all information associated with the new data.” For example, the ’671 Accused Products receive a first notification message of an update to data stored in a data store (e.g., NAS or database). The first notification message indicates the presence of new data (e.g., direct messages) and contains only part of the associated information (e.g., the number of new messages, but not their contents).

## Working with Updates

When a client is being actively used, events will occur that affect the current user and that they must learn about as soon as possible, e.g. when a new message is received. To eliminate the need for the client itself to periodically download these events, there is an update delivery mechanism in which the server sends the user notifications over one of its available connections with the client.

## Message-related event sequences

Each *event* related to a message box (message created, message edited, message deleted, etc) is identified by a unique auto-incremented `pts`, or `qts` in case of secret chat updates, certain bot updates, etc.

Each message box can be considered as some server-side DB table that stores messages and events associated with them. All boxes are completely independent, and each pts sequence is tied to just one box (see below).

Here are the most important updates about messages belonging to the common message ID sequence:

- updateNewMessage - A new incoming/outgoing message belonging to the common message ID sequence was received/sent
- updateEditMessage - A message belonging to the common message ID sequence was edited
- updateDeleteMessages - A message belonging to the common message ID sequence was deleted

**Update handling**

Update handling in Telegram clients consists of receiving events, making sure there were no gaps and no events were missed based on the locally stored state of the correspondent event sequence, and then updating the locally stored state based on the parameters received.

Source: https://core.telegram.org/api/updates

**Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].

Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

48. The ’671 Accused Products perform a method comprising “determining whether an Internet Protocol connection exists between a mobile device and the server device.” For example, the ’671 Accused Products determine whether an internet connection exists between a mobile device and the Telegram servers (e.g., whether the Telegram servers can communicate with the Telegram app on a mobile device).

## Working with Updates

When a client is being actively used, events will occur that affect the current user and that they must learn about as soon as possible, e.g. when a new message is received. To eliminate the need for the client itself to periodically download these events, there is an update delivery mechanism in which the server sends the user notifications over one of its available connections with the client.

Source: https://core.telegram.org/api/updates

### Handling PUSH-notifications

### Configuring the application

To be able to send APNS notifications to Apple servers or GCM notifications to Google servers, application certificates (APNS) or an application key (GCM) must be specified in the application settings.

### Notification structure

An (optionally encrypted) notification is provided as a JSON object in the following format:

```
{
  "data": {
    "loc_key": "CHAT_MESSAGE_CONTACT",
    "loc_args": ["John Doe", "My magical group", "Contact Exchange"],
    "user_id": 14124122,
    "custom": {
      "chat_id": 241233,
      "msg_id": 123
    },
    "sound": "sound1.mp3",
  }
}
```

**CHAT_MESSAGE_TEXT**

**Template example**

`{1} @ {2}: {3}`

**Arguments**

1. Message author
2. Chat name
3. Message body

Source: https://core.telegram.org/api/push-updates

49. The ’671 Accused Products perform a method comprising “if an Internet Protocol connection exists, generating a second notification message for the mobile device to inform the mobile device of the update in data at the one or more data stores.” For example, the ’671 Accused Products, when connected, generate an in-app notification to inform the mobile device of the new data.




Source: https://telegram.org/tour/screenshots




Source: https://www.idownloadblog.com/2022/05/13/how-to-set-custom-notification-sound-telegram/

50. The ’671 Accused Products perform a method comprising “if no Internet Protocol connection exists, causing an Internet Protocol connection manager on the mobile device to open an Internet Protocol connection to the server device to allow a synchronization operation.” For example, the ’671 Accused Products, when disconnected, send a push notification (e.g., APNs or FCM) to the mobile device, which wakes the Telegram app, enabling it to connect to and synchronize with the Telegram servers.

**Handling PUSH-notifications**

**Configuring the application**

To be able to send APNS notifications to Apple servers or GCM notifications to Google servers, application certificates (APNS) or an application key (GCM) must be specified in the application settings.

**Notification structure**

An (optionally encrypted) notification is provided as a JSON object in the following format:


```
{
  "data": {
    "loc_key": "CHAT_MESSAGE_CONTACT",
    "loc_args": ["John Doe", "My magical group", "Contact Exchange"],
    "user_id": 14124122,
    "custom": {
      "chat_id": 241233,
      "msg_id": 123
    },
    "sound": "sound1.mp3",
  }
}
```


**CHAT_MESSAGE_TEXT**

**Template example**

`{1} @ {2}: {3}`

**Arguments**

1. Message author
2. Chat name
3. Message body

Source: https://core.telegram.org/api/push-updates

Sometimes an app needs to do background work in response to a trigger, such as:

- Broadcast messages
- Firebase Cloud Messaging (FCM) messages
- Alarms set by the app

This might be an external trigger (like an FCM message), or it might be in response to an alarm set by the app itself. For example, a game might receive a FCM message telling it to update some assets.

If you can be sure that the task will finish in a few seconds, use asynchronous work to perform the task. The system will allow your app a few seconds to perform any such tasks, even if your app was in the background.

Source: https://developer.android.com/develop/background-work/background-tasks

## application:didReceiveRemoteNotification:fetchCompletionHandler:

**Tells the app that a remote notification arrived that indicates there is data to be fetched.**

iOS 7.0+ | iPadOS 7.0+ | Mac Catalyst 13.1+ | tvOS | visionOS 1.0+

## Discussion

Use this method to process incoming remote notifications for your app. Unlike the `application:didReceiveRemoteNotification:` method, which is called only when your app is running in the foreground, the system calls this method when your app is running in the foreground or background. In addition, if you enabled the remote notifications background mode, the system launches your app (or wakes it from the suspended state) and puts it in the background state when a remote notification arrives. However, the system does not automatically launch your app if the user has force-quit it. In that situation, the user must relaunch your app or restart the device before the system attempts to launch your app automatically again.

Source:
https://developer.apple.com/documentation/uikit/uiapplicationdelegate/application(_:didreceiveremotenotification:fetchcompletionhandler:)?language=objc

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

51. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’671 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’671 Patent (e.g., by using ’671 Accused Products in a manner that practices one or more claims of the ’671 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

52. At a minimum, Telegram has had knowledge of the ’671 Patent at least since service of this Complaint. Telegram also has knowledge of the ’671 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’671 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’671 Accused Products in an infringing manner, including by providing instructions on how to use ’671 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have

known), that its actions have actively induced, and continue to actively induce, infringement of the ’671 Patent.

***Damages***

53. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

54. Despite having knowledge of the ’671 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’671 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’671 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington’s rights with respect to the ’671 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT II

(INFRINGEMENT OF U.S. PATENT NO. 10,693,797)

55. Lexington incorporates the preceding paragraphs herein by reference.

56. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

57. Lexington is the owner of all substantial rights, title, and interest in and to the ’797 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

58. The ’797 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on June 23, 2020, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

59. Telegram directly infringes one or more claims of the ’797 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing Telegram applications providing notification delivery and connection management functionality that incorporate the fundamental technologies covered by the ’797 Patent, including, but not limited to, the Telegram client applications for Android, iOS, Windows, Linux, macOS, and web browsers (e.g., the Telegram iOS client application (version 12.9.4)) (collectively, “the ’797 Accused Products”).

60. Telegram directly infringes at least claim 17 of the ’797 Patent, including through TFZ’s direct infringement and TGI’s direct infringement through TFZ acting as TGI’s agent and on TGI’s behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the ’797 Patent.

61. By way of illustration only, Telegram’s ’797 Accused Products comprise each and every element of claim 17 of the ’797 Patent. The ’797 Accused Products perform “[a] method comprising: communicating over a shared channel and an application specific channel, wherein the application specific channel is a channel for an application on a mobile device to communicate with an application server.” For example, the ’797 Accused Products communicate via a shared channel (e.g., push notifications) and an application specific channel (e.g., in-app notifications). The ’797 Accused Products communicate with Telegram application servers when delivering in-app notifications.




Source: https://apps.apple.com/us/app/telegram-messenger/id686449807




Source:
https://old.reddit.com/r/Telegram/comments/1atsh09/why_does_this_generic_notification_shows_up/




Source: https://telegram.org/tour/screenshots

> **Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].
>
> Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

62. The '797 Accused Products perform a method comprising "blocking the application specific channel to offload traffic therefrom to the shared channel, wherein the blocking occurs in response to a screen of the mobile device being off and the blocking includes blocking the application from accessing the application server over the application specific channel." For example, during periods of app inactivity (e.g., when the mobile device's screen is off), the '797 Accused Products move to the background and are suspended, preventing in-app notifications from being delivered.

## Handling PUSH-notifications

### Configuring the application

To be able to send APNS notifications to Apple servers or GCM notifications to Google servers, application certificates (APNS) or an application key (GCM) must be specified in the application settings.

Source: https://core.telegram.org/api/push-updates

### Overview

Apps move to the background state for many reasons. When the user exits a foreground app, that app moves to the background state briefly before UIKit suspends it. The system may also launch an app directly into the background state, or move a suspended app into the background, and give it time to perform important tasks.

When your app is in the background, it should do as little as possible, and preferably nothing. If your app was previously in the foreground, use the background transition to stop tasks and release any shared resources. If your app enters the background to process an important event, process the event and exit as quickly as possible.

Source: https://developer.apple.com/documentation/uikit/preparing-your-ui-to-run-in-the-background?language=objc

## Understand App Standby

App Standby lets the system determine that an app is idle when the user isn't actively using it. The system makes this determination when the user doesn't touch the app for a certain period of time and none of the following conditions applies:

> ## Understand Doze
>
> If a user leaves a device unplugged and stationary for a period of time, with the screen off, the device enters Doze mode. In Doze mode, the system attempts to conserve battery by restricting apps' access to network and CPU-intensive services. It also prevents apps from accessing the network and defers their jobs, syncs, and standard alarms.
>
> Periodically, the system exits Doze for a brief time to let apps complete their deferred activities. During this *maintenance window*, the system runs all pending syncs, jobs, and alarms, and lets apps access the network.

Source: https://developer.android.com/training/monitoring-device-state/doze-standby.html

63. The '797 Accused Products perform a method "wherein blocking the application from accessing the application server includes suspending the application." For example, the '797 Accused Products suspend when idle to conserve resources.

> ## Overview
>
> Apps move to the background state for many reasons. When the user exits a foreground app, that app moves to the background state briefly before UIKit suspends it. The system may also launch an app directly into the background state, or move a suspended app into the background, and give it time to perform important tasks.
>
> When your app is in the background, it should do as little as possible, and preferably nothing. If your app was previously in the foreground, use the background transition to stop tasks and release any shared resources. If your app enters the background to process an important event, process the event and exit as quickly as possible.

Source: https://developer.apple.com/documentation/uikit/preparing-your-ui-to-run-in-the-background?language=objc



## Understand App Standby

App Standby lets the system determine that an app is idle when the user isn't actively using it. The system makes this determination when the user doesn't touch the app for a certain period of time and none of the following conditions applies:

Source: https://developer.android.com/training/monitoring-device-state/doze-standby.html

64. The ’797 Accused Products perform a method comprising “receiving a message directed to the application over the shared channel from a messaging server.” For example, the ’797 Accused Products receive a push notification via APNs or FCM.




Source:
https://old.reddit.com/r/Telegram/comments/1atsh09/why_does_this_generic_notification_shows_up/




The delivery of remote notifications involves several key components:

- Your company's server, known as the *provider server*
- Apple Push Notification service (APNs)
- The user's device
- Your app running on the user's device

Remote notifications begin with your company's server. You decide which notifications you want to send to your users, and when to send them. When it's time to send a notification, you generate a request that contains the notification data and a unique identifier for the user's device. You then forward your request to APNs, which handles the delivery of the notification to the user's device. Upon receipt of the notification, the operating system on the user's device handles any user interactions and delivers the notification to your app.

Source: https://developer.apple.com/documentation/usernotifications/setting-up-a-remote-notification-server?language=objc

The server side of Firebase Cloud Messaging consists of two components:

- The **FCM backend** provided by Google.
- Your **app server** or other **trusted server environment** where your server logic runs, such as Cloud Functions for Firebase or other cloud environments managed by Google.

> **Tip:** If you need to configure your enterprise network or VPN to allow traffic to and from FCM servers, see Configure your Network for FCM.

Your app server or trusted server environment sends message requests to the FCM backend, which then routes messages to client apps running on users' devices.

Source: https://firebase.google.com/docs/cloud-messaging/server-environment

65. The ’797 Accused Products perform a method comprising “allowing the application to access the application server over the application specific channel in response to receipt of the message.” For example, the push notification received by the ’797 Accused Products wakes the Telegram app and permits it to access Telegram’s application servers.

**application:didReceiveRemoteNotification:fetchCompletionHandler:**

Tells the app that a remote notification arrived that indicates there is data to be fetched.

iOS 7.0+ | iPadOS 7.0+ | Mac Catalyst 13.1+ | tvOS | visionOS 1.0+

## Discussion

Use this method to process incoming remote notifications for your app. Unlike the application:didReceiveRemoteNotification: method, which is called only when your app is running in the foreground, the system calls this method when your app is running in the foreground or background. In addition, if you enabled the remote notifications background mode, the system launches your app (or wakes it from the suspended state) and puts it in the background state when a remote notification arrives. However, the system does not automatically launch your app if the user has force-quit it. In that situation, the user must relaunch your app or restart the device before the system attempts to launch your app automatically again.

Source:
https://developer.apple.com/documentation/uikit/uiapplicationdelegate/application(_:didreceiverremotenotification:fetchcompletionhandler:)?language=objc

Sometimes an app needs to do background work in response to a trigger, such as:

- Broadcast messages
- Firebase Cloud Messaging (FCM) messages
- Alarms set by the app

This might be an external trigger (like an FCM message), or it might be in response to an alarm set by the app itself. For example, a game might receive a FCM message telling it to update some assets.

If you can be sure that the task will finish in a few seconds, use asynchronous work to perform the task. The system will allow your app a few seconds to perform any such tasks, even if your app was in the background.

Source: https://developer.android.com/develop/background-work/background-tasks

66. The '797 Accused Products perform a method "wherein allowing the application to access the application server includes resuming the application for a period of time." For example,

the '797 Accused Products temporarily resume when the mobile device receives a push notification.

> To deliver a background notification, the system wakes your app in the background. On iOS it then calls your app delegate's application:didReceiveRemoteNotification:fetchCompletionHandler: method. On watchOS, it calls your extension delegate's didReceiveRemoteNotification:fetchCompletionHandler: method. Your app has 30 seconds to perform any tasks and call the provided completion handler. For more information, see Handling notifications and notification-related actions.

Source: https://developer.apple.com/documentation/usernotifications/pushing-background-updates-to-your-app?changes=latest_minor&language=objc

> FCM is optimized to work with Doze and App Standby idle modes. FCM high priority messages let you wake your app to engage the user. In Doze or App Standby mode, the system delivers the message and gives the app temporary access to network services and partial wakelocks, then returns the device or app to the idle state. For time-sensitive, user-visible notifications, consider using high priority messages to enable delivery in Doze mode. High priority messages can result in notifications. See FCM's guidance on high priority messages for more information.

Source: https://developer.android.com/training/monitoring-device-state/doze-standby

67. The ’797 Accused Products perform a method comprising “re-blocking the application specific channel after allowing the application to access the application server over the application specific channel for the period of time.” For example, the ’797 Accused Products are suspended again after a temporary resumption.

> To deliver a background notification, the system wakes your app in the background. On iOS it then calls your app delegate’s `application:didReceiveRemoteNotification:fetchCompletionHandler:` method. On watchOS, it calls your extension delegate’s `didReceiveRemoteNotification:fetchCompletionHandler:` method. Your app has 30 seconds to perform any tasks and call the provided completion handler. For more information, see Handling notifications and notification-related actions.

Source: https://developer.apple.com/documentation/usernotifications/pushing-background-updates-to-your-app?changes=latest_minor&language=objc

FCM is optimized to work with Doze and App Standby idle modes. FCM high priority messages let you wake your app to engage the user. In Doze or App Standby mode, the system delivers the message and gives the app temporary access to network services and partial wakelocks, then returns the device or app to the idle state. For time-sensitive, user-visible notifications, consider using high priority messages to enable delivery in Doze mode. High priority messages can result in notifications. See FCM's guidance on high priority messages for more information.

Source: https://developer.android.com/training/monitoring-device-state/doze-standby

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

68. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’797 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’797 Patent (e.g., by using ’797 Accused Products in a manner that practices one or more claims of the ’797 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TFZ, to the extent TFZ’s infringing acts are not attributable to TGI for purposes of direct infringement.

69. At a minimum, Telegram has had knowledge of the ’797 Patent at least since service of this Complaint. Telegram also has knowledge of the ’797 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed

with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’797 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’797 Accused Products in an infringing manner, including by providing instructions on how to use ’797 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’797 Patent.

***Damages***

70. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

71. Despite having knowledge of the ’797 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’797 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’797 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington’s rights with respect to the ’797 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT III**

(INFRINGEMENT OF U.S. PATENT NO. 10,999,203)

72. Lexington incorporates the preceding paragraphs herein by reference.

73. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

74. Lexington is the owner of all substantial rights, title, and interest in and to the ’203 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

75. The ’203 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on May 4, 2021, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

76. Telegram directly infringes one or more claims of the ’203 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing notification delivery and connection management functionality that incorporate the fundamental technologies covered by the ’203 Patent (collectively, “the ’203 Accused Products”).

77. Telegram directly infringes at least claim 1 of the ’203 Patent, including through TMI’s direct infringement and TGI’s direct infringement through TMI acting as TGI’s agent and on TGI’s behalf, by making, using, selling, offering to sell, and/or importing the apparatuses claimed by the ’203 Patent.

78. By way of illustration only, Telegram’s ’203 Accused Products comprise each and every element of claim 1 of the ’203 Patent. The ’203 Accused Products comprise “[a] server comprising: a memory; [and] a processor configured to control the server.” For example, the ’203

Accused Products have servers with memory and processor(s) that provide communication services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

## Working with Different Data Centers

The servers are divided into several data centers (hereinafter "DCs") in different parts of the world. A complete list of proxy access points for these DCs may be obtained using help.getConfig:

Source: https://core.telegram.org/api/datacenter

79. The '203 Accused Products comprise a server comprising a processor configured to control the server for "communicating with a mobile device over a shared channel and an application specific channel, wherein the application specific channel is a channel for an application on the mobile device to communicate with the server and the shared channel is a channel for the server and one or other servers to communicate[] with the mobile device through a messaging server." For example, the '203 Accused Products communicate with a mobile device via a shared channel (e.g., push notifications) via APNs or FCM for communications with a messaging server and an application specific channel (e.g., in-app notifications) for communications with Telegram application servers.




Source:
https://old.reddit.com/r/Telegram/comments/1atsh09/why_does_this_generic_notification_shows_up/




Source: https://telegram.org/tour/screenshots

**Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].

Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf



> The delivery of remote notifications involves several key components:
>
> - Your company's server, known as the *provider server*
> - Apple Push Notification service (APNs)
> - The user's device
> - Your app running on the user's device
>
> Remote notifications begin with your company's server. You decide which notifications you want to send to your users, and when to send them. When it's time to send a notification, you generate a request that contains the notification data and a unique identifier for the user's device. You then forward your request to APNs, which handles the delivery of the notification to the user's device. Upon receipt of the notification, the operating system on the user's device handles any user interactions and delivers the notification to your app.

Source: https://developer.apple.com/documentation/usernotifications/setting-up-a-remote-notification-server?language=objc

> The server side of Firebase Cloud Messaging consists of two components:
>
> - The **FCM backend** provided by Google.
> - Your **app server** or other **trusted server environment** where your server logic runs, such as Cloud Functions for Firebase or other cloud environments managed by Google.
>
> **Tip:** If you need to configure your enterprise network or VPN to allow traffic to and from FCM servers, see Configure your Network for FCM.
>
> Your app server or trusted server environment sends message requests to the FCM backend, which then routes messages to client apps running on users' devices.

Source: https://firebase.google.com/docs/cloud-messaging/server-environment

80. The ’203 Accused Products comprise a server comprising a processor configured to control the server for “offload[ing] traffic from the application specific channel to the shared channel in response to blocking of the application specific channel, wherein the blocking occurs in response to inactivity of the mobile device and the blocking blocks the server from communicating with the application over the application specific channel.” For example, during periods of app inactivity (e.g., when the mobile device’s screen is off), the Telegram app moves to the background and is suspended, preventing in-app notifications from being delivered. The ’203 Accused Products then use push notifications instead of in-app notifications and offload traffic from the application specific channel to the shared channel.

**Handling PUSH-notifications**

**Configuring the application**

To be able to send APNS notifications to Apple servers or GCM notifications to Google servers, application certificates (APNS) or an application key (GCM) must be specified in the application settings.

Source: https://core.telegram.org/api/push-updates

**Overview**

Apps move to the background state for many reasons. When the user exits a foreground app, that app moves to the background state briefly before UIKit suspends it. The system may also launch an app directly into the background state, or move a suspended app into the background, and give it time to perform important tasks.

When your app is in the background, it should do as little as possible, and preferably nothing. If your app was previously in the foreground, use the background transition to stop tasks and release any shared resources. If your app enters the background to process an important event, process the event and exit as quickly as possible.

Source: https://developer.apple.com/documentation/uikit/preparing-your-ui-to-run-in-the-background?language=objc

## Understand App Standby

App Standby lets the system determine that an app is idle when the user isn't actively using it. The system makes this determination when the user doesn't touch the app for a certain period of time and none of the following conditions applies:

## Understand Doze

If a user leaves a device unplugged and stationary for a period of time, with the screen off, the device enters Doze mode. In Doze mode, the system attempts to conserve battery by restricting apps' access to network and CPU-intensive services. It also prevents apps from accessing the network and defers their jobs, syncs, and standard alarms.

Periodically, the system exits Doze for a brief time to let apps complete their deferred activities. During this *maintenance window*, the system runs all pending syncs, jobs, and alarms, and lets apps access the network.

Source: https://developer.android.com/training/monitoring-device-state/doze-standby.html

81. The ’203 Accused Products comprise a server comprising a processor configured to control the server for “sending a message directed to the application over the shared channel through the messaging server while the application specific channel is blocked, wherein the message is in response to new data at the server and notifies the mobile device of the new data.” For example, the ’203 Accused Products send a push notification over the shared channel when the application-specific channel is blocked, notifying the mobile device of new data on Telegram servers.




Source:
https://old.reddit.com/r/Telegram/comments/1atsh09/why_does_this_generic_notification_shows_up/

82. The ’203 Accused Products comprise a server comprising a processor configured to control the server for “receiving a connection from the application over the application specific channel in response to receipt of the message by the mobile device.” For example, the push notification wakes the Telegram app and permits it to access Telegram’s application specific channel. In response, the ’203 Accused Products receive a connection from the Telegram app.

**application:didReceiveRemoteNotification:fetchCompletionHandler:**

Tells the app that a remote notification arrived that indicates there is data to be fetched.

iOS 7.0+ | iPadOS 7.0+ | Mac Catalyst 13.1+ | tvOS | visionOS 1.0+

> **Discussion**
>
> Use this method to process incoming remote notifications for your app. Unlike the application:didReceiveRemoteNotification: method, which is called only when your app is running in the foreground, the system calls this method when your app is running in the foreground or background. In addition, if you enabled the remote notifications background mode, the system launches your app (or wakes it from the suspended state) and puts it in the background state when a remote notification arrives. However, the system does not automatically launch your app if the user has force-quit it. In that situation, the user must relaunch your app or restart the device before the system attempts to launch your app automatically again.

Source:
https://developer.apple.com/documentation/uikit/uiapplicationdelegate/application(_:didreceiveremotenotification:fetchcompletionhandler:)?language=objc

> Sometimes an app needs to do background work in response to a trigger, such as:
>
> - Broadcast messages
> - Firebase Cloud Messaging (FCM) messages
> - Alarms set by the app
>
> This might be an external trigger (like an FCM message), or it might be in response to an alarm set by the app itself. For example, a game might receive a FCM message telling it to update some assets.
>
> If you can be sure that the task will finish in a few seconds, use asynchronous work to perform the task. The system will allow your app a few seconds to perform any such tasks, even if your app was in the background.

Source: https://developer.android.com/develop/background-work/background-tasks

83. The '203 Accused Products comprise a server comprising a processor configured to control the server for "communicat[ing] with the mobile device over the application specific channel for a period of time." For example, the Telegram app temporarily resumes when the

mobile device receives a push notification, enabling communication over the application specific channel between the Telegram app and the ’203 Accused Products.

> To deliver a background notification, the system wakes your app in the background. On iOS it then calls your app delegate’s application:didReceiveRemoteNotification:fetchCompletionHandler: method. On watchOS, it calls your extension delegate’s didReceiveRemoteNotification:fetchCompletionHandler: method. Your app has 30 seconds to perform any tasks and call the provided completion handler. For more information, see Handling notifications and notification-related actions.

Source: https://developer.apple.com/documentation/usernotifications/pushing-background-updates-to-your-app?changes=latest_minor&language=objc

> FCM is optimized to work with Doze and App Standby idle modes. FCM high priority messages let you wake your app to engage the user. In Doze or App Standby mode, the system delivers the message and gives the app temporary access to network services and partial wakelocks, then returns the device or app to the idle state. For time-sensitive, user-visible notifications, consider using high priority messages to enable delivery in Doze mode. High priority messages can result in notifications. See FCM's guidance on high priority messages for more information.

Source: https://developer.android.com/training/monitoring-device-state/doze-standby

84. The '203 Accused Products comprise a server comprising a processor configured to control the server "wherein the application specific channel is blocked after expiration of the period of time." For example, the Telegram app and the application specific channel are suspended again after a temporary resumption.

> To deliver a background notification, the system wakes your app in the background. On iOS it then calls your app delegate's `application:didReceiveRemoteNotification:fetchCompletionHandler:` method. On watchOS, it calls your extension delegate's `didReceiveRemoteNotification:fetchCompletionHandler:` method. Your app has 30 seconds to perform any tasks and call the provided completion handler. For more information, see Handling notifications and notification-related actions.

Source: https://developer.apple.com/documentation/usernotifications/pushing-background-updates-to-your-app?changes=latest_minor&language=objc

> FCM is optimized to work with Doze and App Standby idle modes. FCM high priority messages let you wake your app to engage the user. In Doze or App Standby mode, the system delivers the message and gives the app temporary access to network services and partial wakelocks, then returns the device or app to the idle state. For time-sensitive, user-visible notifications, consider using high priority messages to enable delivery in Doze mode. High priority messages can result in notifications. See FCM's guidance on high priority messages for more information.

Source: https://developer.android.com/training/monitoring-device-state/doze-standby

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

85. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’203 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’203 Patent (e.g., by using ’203 Accused Products in a manner that practices one or more claims of the ’203 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

86. At a minimum, Telegram has had knowledge of the ’203 Patent at least since service of this Complaint. Telegram also has knowledge of the ’203 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed

with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’203 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’203 Accused Products in an infringing manner, including by providing instructions on how to use ’203 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’203 Patent.

***Damages***

87. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

88. Despite having knowledge of the ’203 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’203 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’203 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington’s rights with respect to the ’203 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT IV**

(INFRINGEMENT OF U.S. PATENT NO. 11,089,027)

89. Lexington incorporates the preceding paragraphs herein by reference.

90. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

91. Lexington is the owner of all substantial rights, title, and interest in and to the ’027 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

92. The ’027 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on August 10, 2021, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

93. Telegram directly infringes one or more claims of the ’027 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing authentication, notification delivery, and connection management functionality that incorporate the fundamental technologies covered by the ’027 Patent (collectively, “the ’027 Accused Products”).

94. Telegram directly infringes at least claim 24 of the ’027 Patent, including through TMI’s direct infringement and TGI’s direct infringement through TMI acting as TGI’s agent and on TGI’s behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the ’027 Patent.

95. By way of illustration only, Telegram’s ’027 Accused Products comprise each and every element of claim 24 of the ’027 Patent. The ’027 Accused Products perform “[a] method comprising: sending a first identifier to a client device upon the client device communicating with

a system over a connection, wherein the system is communicatively coupled to a network and a plurality of data stores." For example, the '027 Accused Products send a first identifier (e.g., auth_key_id) to a client device (e.g., a user's computer or mobile device) connected to Telegram's service system (e.g., various Telegram servers). Telegram's service systems (e.g., various Telegram servers) are coupled to a network and a plurality of data stores (e.g., NAS or database).




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

## Protocol description

Before a message (or a multipart message) is transmitted over a network using a transport protocol, it is encrypted in a certain way, and an external header is added at the top of the message that consists of a 64-bit key identifier **auth_key_id** (that uniquely identifies an authorization key for the server as well as the user) and a 128-bit message key **msg_key**.

### Key Identifier (auth_key_id)

The 64 lower-order bits of the SHA1 hash of the authorization key are used to indicate which particular key was used to encrypt a message. Keys must be uniquely defined by the 64 lower-order bits of their SHA1, and in the event of a collision, an authorization key is regenerated. A zero key identifier means that encryption is not used which is permissible for a limited set of message types used during registration to generate an authorization key in a Diffie-Hellman exchange. **For MTProto 2.0, SHA1 is still used here, because auth_key_id should identify the authorization key used independently of the protocol version.**

Source: https://core.telegram.org/mtproto/description

## Transport protocols

Enables the delivery of encrypted containers together with the external header (hereinafter, *Payload*) from client to server and back. Multiple transport protocols are defined:

Source: https://core.telegram.org/mtproto/transports

**Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].

Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

96. The ’027 Accused Products perform a method comprising “receiving registration information from the client device.” For example, the ’027 Accused Products receive registration information (e.g., phone number and verification code) from a client device.




Source: [https://www.businessinsider.com/reference/telegram-login](https://www.businessinsider.com/reference/telegram-login)

**auth.signIn**

Signs in a user with a validated phone number.

Layer 225

```
auth.authorization#2ea2c0d4 flags:# setup_password_required:flags.1?true otherwise_relogin_days:fl
auth.authorizationSignUpRequired#44747e9a flags:# terms_of_service:flags.0?help.TermsOfService = a
---functions---
auth.signIn#8d52a951 flags:# phone_number:string phone_code_hash:string phone_code:flags.0?string
```

**Parameters**

| Name | Type | Description |
|---|---|---|
| **flags** | # | Flags, see TL conditional fields |
| **phone_number** | string | Phone number in the international format |
| **phone_code_hash** | string | SMS-message ID, obtained from auth.sendCode |
| **phone_code** | flags.0?string | Valid numerical code from the SMS-message |
| **email_verification** | flags.1?EmailVerification | Email verification code or token |

Source: https://core.telegram.org/method/auth.signIn

97. The ’027 Accused Products perform a method comprising “sending a second identifier to the client device in response to the received registration information.” For example, the ’027 Accused Products send a second identifier (e.g., user.id) to the client device in response to the registration information.

## auth.signIn

Signs in a user with a validated phone number.

Layer 225

```
auth.authorization#2ea2c0d4 flags:# setup_password_required:flags.1?true otherwise_relogin_days:fl
auth.authorizationSignUpRequired#44747e9a flags:# terms_of_service:flags.0?help.TermsOfService = a
---functions---
auth.signIn#8d52a951 flags:# phone_number:string phone_code_hash:string phone_code:flags.0?string
```

### Parameters

| Name | Type | Description |
|---|---|---|
| flags | # | Flags, see TL conditional fields |
| phone_number | string | Phone number in the international format |
| phone_code_hash | string | SMS-message ID, obtained from auth.sendCode |
| phone_code | flags.0?string | Valid numerical code from the SMS-message |
| email_verification | flags.1?EmailVerification | Email verification code or token |

### Result

auth.Authorization

Source: https://core.telegram.org/method/auth.signIn

## auth.authorization

Contains user authorization info.

Layer 225

```
auth.authorization#2ea2c0d4 flags:# setup_password_required:flags.1?true otherwise_relogin_days:fl
```

### Parameters

| Name | Type | Description |
|---|---|---|
| flags | # | Flags, see TL conditional fields |
| setup_password_required | flags.1? true | Suggests the user to set up a 2-step verification password to be able to log in again |
| otherwise_relogin_days | flags.1? int | If and only if setup_password_required is set and the user declines to set a 2-step verification password, they will be able to log into their account via SMS again only after this many days pass. |
| tmp_sessions | flags.0? int | Number of parallel sessions the client may open to the main connection of its home DC to increase throughput; if absent or ≤ 1, a single main session must be used |
| future_auth_token | flags.2? bytes | A future auth token |
| user | User | Info on authorized user |

Source: https://core.telegram.org/constructor/auth.authorization

## User

Object defines a user.

Layer 225

```
userEmpty#d3bc4b7a id:long = User;
user#31774388 flags:# self:flags.10?true contact:flags.11?true mutual_contact:flags.12?true delete

---functions---

account.updateProfile#78515775 flags:# first_name:flags.0?string last_name:flags.1?string about:fl
account.updateUsername#3e0bdd7c username:string = User;
account.changePhone#70c32edb phone_number:string phone_code_hash:string phone_code:string = User;

contacts.importContactToken#13005788 token:string = User;

channels.getMessageAuthor#ece2a0e6 channel:InputChannel id:int = User;

messages.getFutureChatCreatorAfterLeave#3b7d0ea6 peer:InputPeer = User;

bots.createBot#e5b17f2b flags:# via_deeplink:flags.0?true name:string username:string manager_id:I
```

Source: https://core.telegram.org/type/User

98. The ’027 Accused Products perform a method comprising “configuring a service to receive data from a first data store on behalf of the client device, wherein the service is based on the second identifier.” For example, based on the second identifier (e.g., user.id), the ’027 Accused Products configure their service to receive data from a data store on behalf of a client device.

### account.registerDevice

Register device to receive PUSH notifications

Layer 225

```
boolFalse#bc799737 = Bool;
boolTrue#997275b5 = Bool;
---functions---
account.registerDevice#ec86017a flags:# no_muted:flags.0?true token_type:int token:string app_sand
```

#### Parameters

| Name | Type | Description |
|---|---|---|
| flags | # | Flags, see TL conditional fields |
| no_muted | flags.0?true | Avoid receiving (silent and invisible background) notifications. Useful to save battery. |
| token_type | int | Device token type, see PUSH updates for the possible values. |
| token | string | Device token, see PUSH updates for the possible values. |
| app_sandbox | Bool | If (boolTrue) is transmitted, a sandbox-certificate will be used during transmission. |
| secret | bytes | For FCM and APNS VoIP, optional encryption key used to encrypt push notifications |
| other_uids | Vector<long> | List of user identifiers of other users currently using the client |

Source: https://core.telegram.org/method/account.registerDevice

```
if (TextUtils.isEmpty(regid) || registeringForPush || getUserConfig().getClientUserId() == 0) {
    return;
}
```

Source: https://raw.githubusercontent.com/DrKLO/Telegram/master/TMessagesProj/src/main/java/org/telegram/messenger/MessagesController.java




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

99. The '027 Accused Products perform a method comprising "receiving a communication from the client device to receive data from the plurality of data stores, wherein the communication includes the first identifier." For example, the '027 Accused Products receive a request from a user's computer or mobile device that includes the first identifier (e.g., auth_key_id) to access content stored in Telegram's data stores.

## User Authorization

Authorization is associated with a client's encryption key identifier: **auth_key_id**. No additional parameters need to be passed into methods following authorization.

### We are authorized

As a result of authorization, the client key, **auth_key_id**, becomes associated with the user, and each subsequent API call with this key will be executed with that user's identity. The authorization method itself returns the relevant user. It is best to immediately store the User ID locally in a binding with the key.

Source: https://core.telegram.org/api/auth




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

100. The ’027 Accused Products perform a method comprising “receiving a first message, wherein the first message is indicative of new data at the first data store.” For example, the ’027 Accused Products receive a first message indicating new data (e.g., new messages) on Telegram’s platform.

## Working with Updates

When a client is being actively used, events will occur that affect the current user and that they must learn about as soon as possible, e.g. when a new message is received. To eliminate the need for the client itself to periodically download these events, there is an update delivery mechanism in which the server sends the user notifications over one of its available connections with the client.

### Message-related event sequences

Each *event* related to a message box (message created, message edited, message deleted, etc) is identified by a unique auto-incremented `pts`, or `qts` in case of secret chat updates, certain bot updates, etc.

Each message box can be considered as some server-side DB table that stores messages and events associated with them. All boxes are completely independent, and each pts sequence is tied to just one box (see below).

Source: https://core.telegram.org/api/updates

**Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].

Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

101. The ’027 Accused Products perform a method comprising “transmitting a second message to the client device in response to receipt of the first message and authentication of the client device, wherein the second message is transmitted over a subsequent connection, and wherein the authentication of the client device is based on the first identifier, wherein the subsequent connection is an IP connection between the client device and the system.” For example, the ’027 Accused Products send an in-app notification to a client device after receiving the first message and authenticating the client device. Telegram sends in-app notifications over a subsequent connection (e.g., at a later time). The ’027 Accused Products use the first identifier (e.g., auth_key_id) to authenticate the client device (e.g., to determine its associated user

identity). The in-app notification is transmitted over an IP connection between the client device and Telegram's system.




Source: https://telegram.org/tour/screenshots




Source: https://www.idownloadblog.com/2022/05/13/how-to-set-custom-notification-sound-telegram/

## User Authorization

Authorization is associated with a client's encryption key identifier: **auth_key_id**. No additional parameters need to be passed into methods following authorization.

## We are authorized

As a result of authorization, the client key, **auth_key_id**, becomes associated with the user, and each subsequent API call with this key will be executed with that user's identity. The authorization method itself returns the relevant user. It is best to immediately store the User ID locally in a binding with the key.

Source: https://core.telegram.org/api/auth

## 401 UNAUTHORIZED

There was an unauthorized attempt to use functionality available only to authorized users.

**Examples of Errors:**

- AUTH_KEY_UNREGISTERED: The key is not registered in the system
- AUTH_KEY_INVALID: The key is invalid
- USER_DEACTIVATED: The user has been deleted/deactivated
- SESSION_REVOKED: The authorization has been invalidated, because of the user terminating all sessions
- SESSION_EXPIRED: The authorization has expired
- AUTH_KEY_PERM_EMPTY: The method is unavailable for temporary authorization key, not bound to permanent

Source: https://core.telegram.org/api/errors#401-unauthorized

## Transport protocols

Enables the delivery of encrypted containers together with the external header (hereinafter, *Payload*) from client to server and back. Multiple transport protocols are defined:

- TCP
- WebSocket
- WebSocket over HTTPS
- HTTP
- HTTPS

Source: https://core.telegram.org/mtproto/transports




Figure 3. The multitier Internet-based architecture for application service providers is focussed on accessing application services.

Source: https://www.cse.fau.edu/~borko/Chapter4_ic.pdf

102. The ’027 Accused Products perform a method comprising “receiving a keep-alive message from the client device for maintaining the subsequent connection to provide connectivity for transmission of another message indicative of new data at the first data store.” For example, the ’027 Accused Products receive a keep-alive message (e.g., when the client device’s push notification service wakes the Telegram app), allowing Telegram servers to send another message indicating new data in the data store.




Source: https://www.xda-developers.com/how-to-disable-contact-joined-telegram-notifications/




Source: https://telegram.org/tour/screenshots

**application:didReceiveRemoteNotification:fetchCompletionHandler:**

Tells the app that a remote notification arrived that indicates there is data to be fetched.

iOS 7.0+ | iPadOS 7.0+ | Mac Catalyst 13.1+ | tvOS | visionOS 1.0+

## Discussion

Use this method to process incoming remote notifications for your app. Unlike the `application:didReceiveRemoteNotification:` method, which is called only when your app is running in the foreground, the system calls this method when your app is running in the foreground or background. In addition, if you enabled the remote notifications background mode, the system launches your app (or wakes it from the suspended state) and puts it in the background state when a remote notification arrives. However, the system does not automatically launch your app if the user has force-quit it. In that situation, the user must relaunch your app or restart the device before the system attempts to launch your app automatically again.

Source: https://developer.apple.com/documentation/uikit/uiapplicationdelegate/application(_:didreceiveremotenotification:fetchcompletionhandler:)?language=objc

Sometimes an app needs to do background work in response to a trigger, such as:

- Broadcast messages
- Firebase Cloud Messaging (FCM) messages
- Alarms set by the app

This might be an external trigger (like an FCM message), or it might be in response to an alarm set by the app itself. For example, a game might receive a FCM message telling it to update some assets.

If you can be sure that the task will finish in a few seconds, use asynchronous work to perform the task. The system will allow your app a few seconds to perform any such tasks, even if your app was in the background.

Source: https://developer.android.com/develop/background-work/background-tasks

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

103. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’027 Patent under U.S.C. § 271(b) by knowingly and

intentionally inducing others to directly infringe the ’027 Patent (e.g., by using ’027 Accused Products in a manner that practices one or more claims of the ’027 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

104. At a minimum, Telegram has had knowledge of the ’027 Patent at least since service of this Complaint. Telegram also has knowledge of the ’027 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’027 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’027 Accused Products in an infringing manner, including by providing instructions on how to use ’027 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’027 Patent.

***Damages***

105. Lexington has been damaged as a result of Telegram's infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

106. Despite having knowledge of the '027 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '027 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram's infringing activities relative to the '027 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington's rights with respect to the '027 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT V

(INFRINGEMENT OF U.S. PATENT NO. 11,295,360)

107. Lexington incorporates the preceding paragraphs herein by reference.

108. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

109. Lexington is the owner of all substantial rights, title, and interest in and to the '360 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

110. The '360 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on April 5, 2022, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

111. Telegram directly infringes one or more claims of the '360 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and

applications providing authentication functionality that incorporate the fundamental technologies covered by the ’360 Patent (collectively, “the ’360 Accused Products”).

112. Telegram directly infringes at least claim 1 of the ’360 Patent, including through TMI’s direct infringement and TGI’s direct infringement through TMI acting as TGI’s agent and on TGI’s behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the ’360 Patent.

113. By way of illustration only, Telegram’s ’360 Accused Products comprise each and every element of claim 1 of the ’360 Patent. The ’360 Accused Products perform “[a] method for authenticating one or more devices to provide a service.” For example, the ’360 Accused Products authenticate users’ devices to provide access to communication services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

Source: https://telegram.org/privacy

**Q: How does 2-Step Verification work?**

Logging in with an SMS code is an industry standard in messaging, but if you're looking for more security or have reasons to doubt your mobile carrier or government, we recommend protecting your cloud chats with an additional password.

You can do this in **Settings > Privacy and Security > 2-Step Verification.** Once enabled, you will need both an SMS code and a password to log in. You can also set up a recovery email address that will help regain access, should you forget your password. If you do so, please remember that it's important that the recovery email account is also protected with a strong password and 2-Step Verification when possible.

Source: https://www.telegram.org/faq#q-how-does-2-step-verification-work

114. The ’360 Accused Products perform a method comprising “storing, during an event, information associated with a user of a first device on a server, wherein the stored information includes a phone number associated with a second device of the user.” For example, as part of device authentication (e.g., two-step verification), the ’360 Accused Products store information associated with a user of a first device (e.g., computer or tablet) including the phone number of the user’s second device (e.g., mobile device).

**3.4. Phone Number and Contacts**

Telegram uses phone numbers as unique identifiers so that it is easy for you to switch from SMS and other messaging apps and retain your social graph. We ask your permission before syncing your contacts.

Source: https://telegram.org/privacy

**Q: How does 2-Step Verification work?**

Logging in with an SMS code is an industry standard in messaging, but if you're looking for more security or have reasons to doubt your mobile carrier or government, we recommend protecting your cloud chats with an additional password.

You can do this in **Settings > Privacy and Security > 2-Step Verification**. Once enabled, you will need both an SMS code and a password to log in. You can also set up a recovery email address that will help regain access, should you forget your password. If you do so, please remember that it's important that the recovery email account is also protected with a strong password and 2-Step Verification when possible.

Source: https://www.telegram.org/faq#q-how-does-2-step-verification-work




Source: https://translations.telegram.org/screenshots/821/phrase/Login.PadPhoneHelpTitle

115. The ’360 Accused Products perform a method comprising “receiving information indicating whether to use additional information to authenticate the user to provide the service to a plurality of devices, wherein the plurality of devices includes the first device, wherein the service is related to data stored in one or more data stores associated with the service.” For example, the ’360 Accused Products determine whether to authenticate the user to its service using two-step verification based on the user’s two-step verification settings. The user can log in to Telegram on multiple devices at once, including the first device. The ’360 Accused Products store platform and user data on Telegram servers.

**Q: How does 2-Step Verification work?**

Logging in with an SMS code is an industry standard in messaging, but if you're looking for more security or have reasons to doubt your mobile carrier or government, we recommend protecting your cloud chats with an additional password.

You can do this in **Settings > Privacy and Security > 2-Step Verification.** Once enabled, you will need both an SMS code and a password to log in. You can also set up a recovery email address that will help regain access, should you forget your password. If you do so, please remember that it's important that the recovery email account is also protected with a strong password and 2-Step Verification when possible.

Source: https://www.telegram.org/faq#q-how-does-2-step-verification-work




Source: https://translations.telegram.org/screenshots/6690/phrase/PrivacySettings.TwoStepAuth

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

Source: https://telegram.org/privacy

**Working with Different Data Centers**

The servers are divided into several data centers (hereinafter "DCs") in different parts of the world. A complete list of proxy access points for these DCs may be obtained using help.getConfig:

Source: https://core.telegram.org/api/datacenter

116. The ’360 Accused Products perform a method comprising "querying the user to verify the phone number associated with the second device provided during the event, wherein querying the user to verify the phone number is performed before one or more communications to provide the service to the first device is sent." For example, based on the user's two-step

verification settings, the ’360 Accused Products prompt the user to verify the phone number associated with the second device before allowing access to Telegram services on the first device.




Source: https://translations.telegram.org/screenshots/821/phrase/Login.PadPhoneHelpTitle

117. The ’360 Accused Products perform a method comprising “identifying the first device using an identifier associated with the first device.” For example, the ’360 Accused Products identify the first device using an identifier (e.g., device model or operating system).




Source: https://translations.telegram.org/screenshots/68/phrase/AuthSessions.Title

118. The ’360 Accused Products perform a method comprising “storing, after the event, information associated with the first device, wherein the information associated with the first device includes information related to a previous authentication of the first device.” For example, the ’360 Accused Products store information associated with the first device (e.g., login time/location and client version).




Source:
https://translations.telegram.org/screenshots/10380/phrase/AuthSessions.View.TerminateSession

119. The ’360 Accused Products perform a method comprising “determining whether additional information is needed to perform a subsequent authentication, wherein the determination of whether additional information is needed is based on the identifier associated with the first device.” For example, based on the first device’s identifier (e.g., whether it is a new device), the ’360 Accused Products determine whether additional information (e.g., a two-step verification password) is required before the first device can access Telegram services.




Source:
https://translations.telegram.org/screenshots/10380/phrase/AuthSessions.View.TerminateSession

**Q: How does 2-Step Verification work?**

Logging in with an SMS code is an industry standard in messaging, but if you're looking for more security or have reasons to doubt your mobile carrier or government, we recommend protecting your cloud chats with an additional password.

You can do this in **Settings > Privacy and Security > 2-Step Verification.** Once enabled, you will need both an SMS code and a password to log in. You can also set up a recovery email address that will help regain access, should you forget your password. If you do so, please remember that it's important that the recovery email account is also protected with a strong password and 2-Step Verification when possible.

Source: https://www.telegram.org/faq#q-how-does-2-step-verification-work

**Two-Step Verification**

Another addition to the Privacy and Security section is **Two Step Verification**. It allows you to set up a password that will be required every time you log into your account from a new device – in addition to the code you get in the SMS.

Source: https://telegram.org/blog/sessions-and-2-step-verification

120. The ’360 Accused Products perform a method comprising “receiving, by the server, the additional information from the user; and attempting to perform the subsequent authentication based on the additional information.” For example, the ’360 Accused Products

receive the additional information (e.g., a two-step verification password) and use it to authenticate the first device.




Source: https://translations.telegram.org/screenshots/3635/phrase/Login.CodeSentSms

> **Q: How does 2-Step Verification work?**
>
> Logging in with an SMS code is an industry standard in messaging, but if you're looking for more security or have reasons to doubt your mobile carrier or government, we recommend protecting your cloud chats with an additional password.
>
> You can do this in **Settings > Privacy and Security > 2-Step Verification.** Once enabled, you will need both an SMS code and a password to log in. You can also set up a recovery email address that will help regain access, should you forget your password. If you do so, please remember that it's important that the recovery email account is also protected with a strong password and 2-Step Verification when possible.

Source: https://www.telegram.org/faq#q-how-does-2-step-verification-work

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

121. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’360 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’360 Patent (e.g., by using ’360 Accused Products in a manner that practices one or more claims of the ’360 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

122. At a minimum, Telegram has had knowledge of the ’360 Patent at least since service of this Complaint. Telegram also has knowledge of the ’360 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its

infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’360 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’360 Accused Products in an infringing manner, including by providing instructions on how to use ’360 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’360 Patent.

***Damages***

123. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

124. Despite having knowledge of the ’360 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’360 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’360 Patent have, thus, been, and continue to be, willful, wanton,

and deliberate in disregard of Lexington's rights with respect to the '360 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT VI**

(INFRINGEMENT OF U.S. PATENT NO. 11,694,241)

125. Lexington incorporates the preceding paragraphs herein by reference.

126. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

127. Lexington is the owner of all substantial rights, title, and interest in and to the '241 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

128. The '241 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on July 4, 2023, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

129. Telegram directly infringes one or more claims of the '241 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing authentication, data synchronization, and notification delivery functionality that incorporate the fundamental technologies covered by the '241 Patent (collectively, "the '241 Accused Products").

130. Telegram directly infringes at least claim 23 of the '241 Patent, including through TMI's direct infringement and TGI's direct infringement through TMI acting as TGI's agent and on TGI's behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the '241 Patent.

131. By way of illustration only, Telegram's '241 Accused Products comprise each and every element of claim 23 of the '241 Patent. The '241 Accused Products perform "[a] method of communicating by a system with one or more data stores." For example, the '241 Accused Products have servers that store data and provide communication services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

132. The '241 Accused Products perform a method comprising "receiving, over an Internet Protocol connection between the system and a mobile device associated with a first user,

a communication from the mobile device to receive new data from the one or more data stores." For example, the '241 Accused Products receive a communication, over an IP connection, from a first user's mobile device to receive new data from data stored on Telegram servers.

> **Subscribing to Updates**
>
> Update events are sent to an authorized user into the last active connection (except for connections needed for downloading / uploading files).
>
> So to start receiving updates the client needs to init connection and call API method, e.g. to fetch current state.

Source: https://core.telegram.org/api/updates

133. The '241 Accused Products perform a method "wherein the communication is based on input from the first user at the mobile device." For example, the communication received by '241 Accused Products is based on the first user's input (e.g., interacting with the Telegram app).







Source: https://telegram.org/tour/screenshots

134. The ’241 Accused Products perform a method comprising “transmitting data received from the one or more data stores to the mobile device over an Internet Protocol connection between the system and the mobile device associated with the first user based on authentication of the mobile device.” For example, the ’241 Accused Products transmit data from Telegram servers to the mobile device after authenticating the mobile device.

## We are authorized

As a result of authorization, the client key, **auth_key_id**, becomes associated with the user, and each subsequent API call with this key will be executed with that user's identity. The authorization method itself returns the relevant user. It is best to immediately store the User ID locally in a binding with the key.

Only a small portion of the API methods are available to **unauthorized** users:

- account.deleteAccount - Delete the user's account from the telegram servers.
- account.getPassword - Obtain configuration for two-factor authorization with password
- account.sendVerifyEmailCode - Send an email verification code.
- account.verifyEmail - Verify an email address.
- auth.bindTempAuthKey - Binds a temporary authorization key `temp_auth_key_id` to the permanent authorization key `perm_auth_key_id`.
- auth.cancelCode - Cancel the login verification code
- auth.checkPaidAuth - Checks the status of a login payment.
- auth.checkPassword - Try logging to an account protected by a 2FA password.
- auth.exportLoginToken - Generate a login token, for login via QR code.
- auth.finishPasskeyLogin - Complete login with a passkey over an unauthenticated connection, see here » for more info.
- auth.importAuthorization - Logs in a user using a key transmitted from his native data-center.
- auth.importBotAuthorization - Login as a bot
- auth.importLoginToken - Login using a redirected login token, generated in case of DC mismatch during QR code login.
- auth.importWebTokenAuthorization - Login by importing an authorization token
- auth.initPasskeyLogin - Initialize login with a passkey over an unauthenticated connection, see here » for more info.
- auth.reportMissingCode - Official apps only, reports that the SMS authentication code wasn't delivered.
- auth.requestFirebaseSms - Request an SMS code via Firebase.

Source: https://core.telegram.org/api/auth#invalidating-login-codes

## 401 UNAUTHORIZED

There was an unauthorized attempt to use functionality available only to authorized users.

**Examples of Errors:**

- AUTH_KEY_UNREGISTERED: The key is not registered in the system
- AUTH_KEY_INVALID: The key is invalid
- USER_DEACTIVATED: The user has been deleted/deactivated
- SESSION_REVOKED: The authorization has been invalidated, because of the user terminating all sessions
- SESSION_EXPIRED: The authorization has expired
- AUTH_KEY_PERM_EMPTY: The method is unavailable for temporary authorization key, not bound to permanent

Source: https://core.telegram.org/api/errors#401-unauthorized

135. The ’241 Accused Products perform a method “wherein the authentication is based on a token comprising a unique string of data, the token having been previously assigned to the mobile device.” For example, the ’241 Accused Products authenticate the mobile device based on a unique authentication token (e.g., auth_key_id). The ’241 Accused Products previously assigned the authentication token to the mobile device and verify it with every API request made to Telegram’s servers.

> **User Authorization**
>
> Authorization is associated with a client's encryption key identifier: **auth_key_id**. No additional parameters need to be passed into methods following authorization.

> **We are authorized**
>
> As a result of authorization, the client key, **auth_key_id**, becomes associated with the user, and each subsequent API call with this key will be executed with that user's identity. The authorization method itself returns the relevant user. It is best to immediately store the User ID locally in a binding with the key.

Source: https://core.telegram.org/api/auth

## Protocol description

Before a message (or a multipart message) is transmitted over a network using a transport protocol, it is encrypted in a certain way, and an external header is added at the top of the message that consists of a 64-bit key identifier **auth_key_id** (that uniquely identifies an authorization key for the server as well as the user) and a 128-bit message key **msg_key**.

**Key Identifier (auth_key_id)**

The 64 lower-order bits of the SHA1 hash of the authorization key are used to indicate which particular key was used to encrypt a message. Keys must be uniquely defined by the 64 lower-order bits of their SHA1, and in the event of a collision, an authorization key is regenerated. A zero key identifier means that encryption is not used which is permissible for a limited set of message types used during registration to generate an authorization key in a Diffie-Hellman exchange. **For MTProto 2.0, SHA1 is still used here, because auth_key_id should identify the authorization key used independently of the protocol version.**

Source: https://core.telegram.org/mtproto/description

136. The ’241 Accused Products perform a method comprising “receiving a first notification message of new data at the one or more data stores; sending a message of a first type to the mobile device to inform the mobile device of the new data at the one or more data stores.” For example, the ’241 Accused Products receive a first notification message of new data (e.g., a direct message) and send an in-app notification (i.e., “a message of a first type”) to the mobile device.

> **Working with Updates**
>
> When a client is being actively used, events will occur that affect the current user and that they must learn about as soon as possible, e.g. when a new message is received. To eliminate the need for the client itself to periodically download these events, there is an update delivery mechanism in which the server sends the user notifications over one of its available connections with the client.

### Message-related event sequences

Each *event* related to a message box (message created, message edited, message deleted, etc) is identified by a unique auto-incremented `pts`, or `qts` in case of secret chat updates, certain bot updates, etc.

Each message box can be considered as some server-side DB table that stores messages and events associated with them. All boxes are completely independent, and each pts sequence is tied to just one box (see below).

Source: https://core.telegram.org/api/updates




Source: https://telegram.org/tour/screenshots

> **Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].
>
> Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf

137. The ’241 Accused Products perform a method “wherein the message of the first type is sent over an Internet Protocol connection between the system and the mobile device associated with the first user in response to receipt of the first notification message.” For example, the ’241 Accused Products transmit the in-app notification upon receipt of the first notification message.




Source: https://telegram.org/tour/screenshots




Source: https://www.idownloadblog.com/2022/05/13/how-to-set-custom-notification-sound-telegram/

138. The ’241 Accused Products perform a method comprising “sending a message of a second type to the mobile device.” For example, the ’241 Accused Products send a push notification (i.e., “a message of a second type”) to the mobile device.




Source:
https://old.reddit.com/r/Telegram/comments/1atsh09/why_does_this_generic_notification_shows_up/

139. The ’241 Accused Products perform a method “wherein the message of the second type is a notification sent through a push operation over a connection that is different from an Internet Protocol connection between the system and the mobile device associated with the first user in response to receipt of the first notification message.” For example, the ’241 Accused Products send the push notification over a separate connection (e.g., via APNs or FCM).



The delivery of remote notifications involves several key components:

- Your company's server, known as the *provider server*
- Apple Push Notification service (APNs)
- The user's device
- Your app running on the user's device

Remote notifications begin with your company's server. You decide which notifications you want to send to your users, and when to send them. When it's time to send a notification, you generate a request that contains the notification data and a unique identifier for the user's device. You then forward your request to APNs, which handles the delivery of the notification to the user's device. Upon receipt of the notification, the operating system on the user's device handles any user interactions and delivers the notification to your app.

Source: https://developer.apple.com/documentation/usernotifications/setting-up-a-remote-notification-server?language=objc

The server side of Firebase Cloud Messaging consists of two components:

- The **FCM backend** provided by Google.
- Your **app server** or other **trusted server environment** where your server logic runs, such as Cloud Functions for Firebase or other cloud environments managed by Google.

★ **Tip:** If you need to configure your enterprise network or VPN to allow traffic to and from FCM servers, see Configure your Network for FCM.

Your app server or trusted server environment sends message requests to the FCM backend, which then routes messages to client apps running on users' devices.

Source: https://firebase.google.com/docs/cloud-messaging/server-environment

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

140. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the '241 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the '241 Patent (e.g., by using '241 Accused Products in a manner that practices one or more claims of the '241 Patent). Such induced direct infringers include Telegram's customers and/or other end users, as well as TMI, to the extent TMI's infringing acts are not attributable to TGI for purposes of direct infringement.

141. At a minimum, Telegram has had knowledge of the '241 Patent at least since service of this Complaint. Telegram also has knowledge of the '241 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '241 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the '241 Accused Products in an infringing manner, including by providing instructions on how to use '241 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have

known), that its actions have actively induced, and continue to actively induce, infringement of the ’241 Patent.

***Damages***

142. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

143. Despite having knowledge of the ’241 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’241 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’241 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington’s rights with respect to the ’241 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT VII

(INFRINGEMENT OF U.S. PATENT NO. 11,915,281)

144. Lexington incorporates the preceding paragraphs herein by reference.

145. This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. § 271, *et seq*.

146. Lexington is the owner of all substantial rights, title, and interest in and to the ’281 Patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

147. The ’281 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on February 27, 2024, after full and fair examination.

***Direct Infringement (35 U.S.C. § 271(a))***

148. Telegram directly infringes one or more claims of the ’281 Patent in this District and elsewhere in Texas and the United States under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Telegram communications platform, including its servers and applications providing authentication, data synchronization, and notification delivery functionality that incorporate the fundamental technologies covered by the ’281 Patent (collectively, “the ’281 Accused Products”).

149. Telegram directly infringes at least claim 23 of the ’281 Patent, including through TMI’s direct infringement and TGI’s direct infringement through TMI acting as TGI’s agent and on TGI’s behalf, by using, practicing, and/or performing (including via testing) the methods claimed by the ’281 Patent.

150. By way of illustration only, Telegram’s ’281 Accused Products comprise each and every element of claim 23 of the ’281 Patent. The ’281 Accused Products perform “[a] method of communicating by a system with one or more data stores.” For example, the ’281 Accused Products have servers that store data and provide communication services.




Source: https://adevcan.com/privacy/telegram-review/

**3.3.1. Cloud Chats**

Telegram is a cloud service. We store messages, photos, videos and documents from your *cloud chats* on our servers so that you can access your data from any of your devices anytime without having to rely on third-party backups. All data is stored heavily encrypted and the encryption keys in each case are stored in several other data centers in different jurisdictions. This way local engineers or physical intruders cannot get access to user data.

**4.1. Storing Data**

If you signed up for Telegram from the UK or the EEA, your data is stored in data centers in the Netherlands. These are third-party provided data centers in which Telegram rents a designated space. However, the servers and networks that sit inside these data centers and on which your personal data is stored are owned by Telegram. As such, we do not share your personal data with such data centers. All data is stored heavily encrypted so that local Telegram engineers or physical intruders cannot get access.

Source: https://telegram.org/privacy

151. The ’281 Accused Products perform a method comprising “receiving, over an Internet Protocol connection between the system and a mobile device associated with a first user, a communication from the mobile device to receive new data from the one or more data stores.” For example, the ’281 Accused Products receive a communication, over an IP connection, from a first user’s mobile device to receive new data from data stored on Telegram servers.

## Subscribing to Updates

Update events are sent to an authorized user into the last active connection (except for connections needed for downloading / uploading files).

So to start receiving updates the client needs to init connection and call API method, e.g. to fetch current state.

Source: https://core.telegram.org/api/updates

152. The ’281 Accused Products perform a method “wherein the communication is based on input from the first user at the mobile device.” For example, the communication received by ’281 Accused Products is based on the first user’s input (e.g., interacting with the Telegram app).







Source: https://telegram.org/tour/screenshots

153. The ’281 Accused Products perform a method comprising “transmitting data received from the one or more data stores to the mobile device over a subsequent Internet Protocol connection based on authentication of the mobile device.” For example, after authenticating the mobile device, the ’281 Accused Products transmit data from Telegram servers to the mobile device over the subsequent IP connection.

### We are authorized

As a result of authorization, the client key, **auth_key_id**, becomes associated with the user, and each subsequent API call with this key will be executed with that user's identity. The authorization method itself returns the relevant user. It is best to immediately store the User ID locally in a binding with the key.

Only a small portion of the API methods are available to **unauthorized** users:

- account.deleteAccount - Delete the user's account from the telegram servers.
- account.getPassword - Obtain configuration for two-factor authorization with password
- account.sendVerifyEmailCode - Send an email verification code.
- account.verifyEmail - Verify an email address.
- auth.bindTempAuthKey - Binds a temporary authorization key `temp_auth_key_id` to the permanent authorization key `perm_auth_key_id`.
- auth.cancelCode - Cancel the login verification code
- auth.checkPaidAuth - Checks the status of a login payment.
- auth.checkPassword - Try logging to an account protected by a 2FA password.
- auth.exportLoginToken - Generate a login token, for login via QR code.
- auth.finishPasskeyLogin - Complete login with a passkey over an unauthenticated connection, see here » for more info.
- auth.importAuthorization - Logs in a user using a key transmitted from his native data-center.
- auth.importBotAuthorization - Login as a bot
- auth.importLoginToken - Login using a redirected login token, generated in case of DC mismatch during QR code login.
- auth.importWebTokenAuthorization - Login by importing an authorization token
- auth.initPasskeyLogin - Initialize login with a passkey over an unauthenticated connection, see here » for more info.
- auth.reportMissingCode - Official apps only, reports that the SMS authentication code wasn't delivered.
- auth.requestFirebaseSms - Request an SMS code via Firebase.

Source: https://core.telegram.org/api/auth#invalidating-login-codes

### 401 UNAUTHORIZED

There was an unauthorized attempt to use functionality available only to authorized users.

**Examples of Errors:**

- AUTH_KEY_UNREGISTERED: The key is not registered in the system
- AUTH_KEY_INVALID: The key is invalid
- USER_DEACTIVATED: The user has been deleted/deactivated
- SESSION_REVOKED: The authorization has been invalidated, because of the user terminating all sessions
- SESSION_EXPIRED: The authorization has expired
- AUTH_KEY_PERM_EMPTY: The method is unavailable for temporary authorization key, not bound to permanent

Source: https://core.telegram.org/api/errors#401-unauthorized

154. The ’281 Accused Products perform a method “wherein the authentication is based on a token comprising a unique string of data, the token having been previously assigned to the mobile device; wherein the token is received over the subsequent Internet Protocol connection.” For example, the ’281 Accused Products authenticate the mobile device based on a unique authentication token (e.g., auth_key_id). The ’281 Accused Products previously assigned the authentication token to the mobile device and verify it with every API request made to Telegram’s servers. The ’281 Accused Products receive the authentication token over the subsequent connection

> **User Authorization**
>
> Authorization is associated with a client's encryption key identifier: **auth_key_id.** No additional parameters need to be passed into methods following authorization.

> **We are authorized**
>
> As a result of authorization, the client key, **auth_key_id**, becomes associated with the user, and each subsequent API call with this key will be executed with that user's identity. The authorization method itself returns the relevant user. It is best to immediately store the User ID locally in a binding with the key.

Source: https://core.telegram.org/api/auth

## Protocol description

Before a message (or a multipart message) is transmitted over a network using a transport protocol, it is encrypted in a certain way, and an external header is added at the top of the message that consists of a 64-bit key identifier **auth_key_id** (that uniquely identifies an authorization key for the server as well as the user) and a 128-bit message key **msg_key**.

### Key Identifier (auth_key_id)

The 64 lower-order bits of the SHA1 hash of the authorization key are used to indicate which particular key was used to encrypt a message. Keys must be uniquely defined by the 64 lower-order bits of their SHA1, and in the event of a collision, an authorization key is regenerated. A zero key identifier means that encryption is not used which is permissible for a limited set of message types used during registration to generate an authorization key in a Diffie-Hellman exchange. **For MTProto 2.0, SHA1 is still used here, because auth_key_id should identify the authorization key used independently of the protocol version.**

Source: https://core.telegram.org/mtproto/description

155. The ’281 Accused Products perform a method comprising “receiving a first notification message of new data at the one or more data stores; sending a message of a first type to the mobile device to inform the mobile device of the new data at the one or more data stores.” For example, the ’281 Accused Products receive a first notification message of new data (e.g., a direct message) and send an in-app notification (i.e., “a message of a first type”) to the mobile device.

> **Working with Updates**
>
> When a client is being actively used, events will occur that affect the current user and that they must learn about as soon as possible, e.g. when a new message is received. To eliminate the need for the client itself to periodically download these events, there is an update delivery mechanism in which the server sends the user notifications over one of its available connections with the client.

> **Message-related event sequences**
>
> Each *event* related to a message box (message created, message edited, message deleted, etc) is identified by a unique auto-incremented `pts`, or `qts` in case of secret chat updates, certain bot updates, etc.
>
> Each message box can be considered as some server-side DB table that stores messages and events associated with them. All boxes are completely independent, and each pts sequence is tied to just one box (see below).

Source: https://core.telegram.org/api/updates




Source: https://telegram.org/tour/screenshots

> **Architecture:** All major IM services are *centralized*, as shown in Table I. Therefore, all user communications in such services are exchanged through servers hosted by the IM provider companies, e.g., Telegram Messenger LLP (note that some less popular services use a peer-to-peer architecture, e.g., FireChat [80], Ring [72], and Briar [15]). Each IM service has a server for authentication and key exchange. A database server stores message contents and other user information (possibly encrypted with client keys). Some IMs use Content Delivery Networks (CDNs) to run their databases to improve quality of service and resist attacks. Existing IM services use various messaging protocols for user communications, including Signal [31], Matrix [8], MTProto [55], and Off-the-Record [14]. Each of these protocols involves several stages including authentication, key exchange, message transmission, re-keying, and MAC key publishing [44].
>
> Popular IM services intermediate all user communications by having user traffic go through their servers. Such a centralized architecture allows IM providers to offer high quality of services and solves critical issues like reaching to offline clients and clients behind NAT/firewalls. However, this presents different privacy threats to the users, as IM servers are involved in all user communications. Some IM services deploy end-to-end encryption to alleviate this, as presented below.

Source: https://people.cs.umass.edu/~amir/papers/NDSS20-SIM.pdf

156. The ’281 Accused Products perform a method “wherein the message of the first type is sent over the subsequent Internet Protocol connection based on the first notification message.” For example, the ’281 Accused Products transmit the in-app notification upon receipt of the first notification message.




Source: https://telegram.org/tour/screenshots




Source: [https://www.idownloadblog.com/2022/05/13/how-to-set-custom-notification-sound-telegram/](https://www.idownloadblog.com/2022/05/13/how-to-set-custom-notification-sound-telegram/)

157. The ’281 Accused Products perform a method comprising “sending a message of a second type to the mobile device.” For example, the ’281 Accused Products send a push notification (i.e., “a message of a second type”) to the mobile device.




Source:
https://old.reddit.com/r/Telegram/comments/1atsh09/why_does_this_generic_notification_shows_up/

158. The '281 Accused Products perform a method "wherein the message of the second type is a notification sent through a push operation over a connection that is different from the subsequent Internet Protocol connection in response to receipt of the first notification message." For example, the '281 Accused Products send the push notification over a separate connection (e.g., via APNs or FCM) in response to receiving the first notification message.



The delivery of remote notifications involves several key components:

- Your company's server, known as the *provider server*
- Apple Push Notification service (APNs)
- The user's device
- Your app running on the user's device

Remote notifications begin with your company's server. You decide which notifications you want to send to your users, and when to send them. When it's time to send a notification, you generate a request that contains the notification data and a unique identifier for the user's device. You then forward your request to APNs, which handles the delivery of the notification to the user's device. Upon receipt of the notification, the operating system on the user's device handles any user interactions and delivers the notification to your app.

Source: https://developer.apple.com/documentation/usernotifications/setting-up-a-remote-notification-server?language=objc

The server side of Firebase Cloud Messaging consists of two components:

- The **FCM backend** provided by Google.
- Your **app server** or other **trusted server environment** where your server logic runs, such as Cloud Functions for Firebase or other cloud environments managed by Google.

**Tip:** If you need to configure your enterprise network or VPN to allow traffic to and from FCM servers, see Configure your Network for FCM.

Your app server or trusted server environment sends message requests to the FCM backend, which then routes messages to client apps running on users' devices.

Source: https://firebase.google.com/docs/cloud-messaging/server-environment

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

159. In addition and/or in the alternative to the direct infringements, Telegram indirectly infringes one or more claims of the ’281 Patent under U.S.C. § 271(b) by knowingly and intentionally inducing others to directly infringe the ’281 Patent (e.g., by using ’281 Accused Products in a manner that practices one or more claims of the ’281 Patent). Such induced direct infringers include Telegram’s customers and/or other end users, as well as TMI, to the extent TMI’s infringing acts are not attributable to TGI for purposes of direct infringement.

160. At a minimum, Telegram has had knowledge of the ’281 Patent at least since service of this Complaint. Telegram also has knowledge of the ’281 Patent since receiving detailed correspondence from Lexington prior to the filing of the Complaint, alerting Telegram to its infringements. Since receiving notice of its infringements, Telegram has actively induced, and continues to actively induce, the direct infringements of its customers and/or other end users (e.g., as illustrated above) as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’281 Patent. Indeed, Telegram has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products, including marketing materials, user manuals, and online instructional materials (e.g., those available via https://telegram.org) that specifically teach and encourage customers and other end users to use the ’281 Accused Products in an infringing manner, including by providing instructions on how to use ’281 Accused Products. By providing such instructions and support, Telegram knows (and has known), or should know (and should have

known), that its actions have actively induced, and continue to actively induce, infringement of the ’281 Patent.

***Damages***

161. Lexington has been damaged as a result of Telegram’s infringing conduct described in this Count. Telegram is, thus, liable to Lexington in an amount that adequately compensates it for Telegram’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

162. Despite having knowledge of the ’281 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’281 Patent, Telegram has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Telegram’s infringing activities relative to the ’281 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of Lexington’s rights with respect to the ’281 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

163. Lexington is entitled to recover from Telegram the damages sustained by Lexington as a result of Telegram’s wrongful acts and willful infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

164. Lexington has incurred and will incur attorneys’ fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and, in such case, Lexington is entitled to recover its reasonable and necessary attorneys’ fees, costs, and expenses.

**JURY DEMAND**

165. Lexington hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**PRAYER FOR RELIEF**

166. Lexington respectfully requests that the Court find in its favor and against Telegram, and that the Court grant Lexington the following relief:

(i) Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by Telegram;

(ii) Judgment that one or more claims of the Asserted Patents have been willfully infringed, either literally and/or under the doctrine of equivalents, by Telegram;

(iii) Judgment that Telegram account for and pay to Lexington all damages and costs incurred by Lexington because of Telegram's infringements and other conduct complained of herein, including an accounting for any sales or damages not presented at trial;

(iv) Judgment that Telegram account for and pay to Lexington a reasonable, ongoing, post-judgment royalty because of Telegram's infringements, including continuing infringing activities, and other conduct complained of herein;

(v) Judgment that Lexington be granted pre-judgment and post-judgment interest on the damages caused by Telegram's infringements and other conduct complained of herein;

(vi) Judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and award enhanced damages; and

(vii) Such other and further relief as the Court deems just and equitable.

Dated: October 19, 2026

Respectfully submitted,

*/s/ Patrick J. Conroy*
**Patrick J. Conroy**
Texas Bar No. 24012448
**Ryan P. Griffin**
Texas Bar No. 24053687
**T. William Kennedy Jr.**
Texas Bar No. 24055771
**Jonathan H. Rastegar**
Texas Bar No. 24064043
**Nathan L. Levenson**
Texas Bar No. 24097992
**Brandon G. Moore**
Texas Bar No. 24082372
**NELSON BUMGARDNER CONROY PC**
2727 N. Harwood St., Suite 250
Dallas, TX 75201
pat@nelbum.com
ryan@nelbum.com
bill@nelbum.com
jon@nelbum.com
nathan@nelbum.com
brandon@nelbum.com

**Attorneys for Plaintiff Lexington Technologies, LLC**